It looks like everyone's here. All right, the panel is ready to proceed. You may proceed. Good morning, and may it please the Court, David Peters, on behalf of the United States of America. The President issued the Challenge Executive Order to address the threats posed to federal contracting by a once-in-a-century pandemic. The Order does so by directing agencies to contract only with those entities that agree to comply with certain COVID-19 safety protocols. The Order thus falls within the decades-long tradition of executive action, taken by presidents of both parties and consistently upheld by the courts, that advance the economy and efficiency of federal contracting. The District Court recognized that the Order bears a close nexus to economy and efficiency, but mistakenly enjoined the Order and its implementing materials on other grounds. I would like to start, if I may, with the Order's nexus to economy and efficiency. The question before this Court concerns whether the District Court abused its discretion when, in December of 2021, it enjoined the Executive Order based on the record before it. At the time, the Order, as the Acting OMB Director's determination made clear, advanced the economy of federal contracting. At the time, vaccination was the most effective method to reduce transmission of a deadly and highly virulent disease. Vaccination also provided the best protection for those that contracted the disease from becoming seriously ill and dying. Taken together, those impacts advanced the economy and efficiency of federal contracting by reducing absenteeism from the federal contractor workforce. The District Court straightforwardly understood that this Order advanced economy and efficiency and that it outweighed— Counsel, since we're talking about an Executive Order, what are the effective limitations? What is the limiting principle on the President's authority? The economy and efficiency test is a material limitation on the President's power. So could the President require that anyone who works for a government contractor not live in a home with a smoker? Your Honor, it's very difficult to imagine that being a valid Executive Order because it's not particularly work-related in the way that this Executive Order was. What about obesity? Normally, they have health problems as a result of obesity. I mean, that's all well documented. Can the President require a certain fitness level of all employees of government contractors? Again, Your Honor, it's very difficult to imagine that Executive Order being sustained, but precisely because— Why not? If it would improve employee health and reduce absenteeism, why is it so hard to imagine? Your Honor, those kind of latent health problems that affect contractors more generally have been around for decades and have never posed the kind of significant and acute threats that the pandemic posed, and that makes good sense. I mean, again, the pandemic, as experience has shown, really posed unique challenges to the everyday work habits of the American people and, in particular, into federal contracting. So the President determined quite reasonably that in the threat of this once-in-a-century pandemic, that it's quite different in kind from the kind of latent health— Taking it to its logical conclusion, can the President require an employee or the spouse of an employee to take birth control pills in order to avoid missing time for family leave time? No, Your Honor, I don't believe so. As to a spouse, that seems quite divorced from the contract workplace. Here, this Executive Order only covers certain covered contractors who are working on federal contracts or those that are working in the same place where federal contracting is being done. The birth control one, Your Honor, might also run into some independent constitutional challenges that aren't implicated in this case at all. And so, again, throughout the seven decades that the Executive Order has been on the books, Presidents have consistently used this authority in a way that addresses meaningful limitations and threats. Going back to Judge Englehart's very first question, aside from you cited the language, which talks about economy and efficiency, but, I mean, give some teeth to that. What is the meaningful limiting principle that those terms provide? What would be out of bounds? Your Honor, I think, again, something that is directed towards contractors' family members would be out of bounds. Again, this has to have a close nexus to the economy and efficiency of federal contracting. It has to advance, as this Executive Order does, and as the district court found, has to advance the efficiency with which contracting is done. And it makes perfect sense that an Executive Order that includes a rule of decision saying, don't contract with those entities that fail to adopt policies that will prevent late work or work that will be over the cost, that meaningfully advances the economy. I noticed that you said, and I think very correctly, that those are directed to the contractor. That's a policy directed to the contractor. What instances can you give us where the order is directed to the employees of the contractor? Your Honor, this order is directed towards contractors. It's frankly directed towards agencies about who they will elect to do contracting. But it applies. I hate to interrupt you, and I appreciate your answer, but it applies even to employees who are not working on the government contract, as I understand it. Correct me if I'm wrong. So this order is requiring each individual to do something as opposed to, for instance, a requirement for nondiscriminatory hiring practices or compliance with wage and hour and so on and so forth. This order goes not to the contractor, but rather to the individuals who work for the contractor. Your Honor, that is a difference between this Executive Order and past Executive Orders. You know, we would say past Executive Orders have also reached noncontractors. So the pricing order in Kahn, for example, controlled wage and pricing for contracting employees that were working on federal contractors, but also employees that were not working on federal contracts. But Your Honor is correct. This order is slightly different in the sense that it is directed towards employees. Are there any others that go to the employee, require compliance by the individual employee as opposed to the contractor? Can you think of any other instance? Your Honor, we're not aware of an order that fits directly to that. It makes sense in this context, Your Honor. I mean, the economy and efficiency determination is inherently contextual. And here, as I said, at a time that the Executive Order was enjoined, vaccination was the most effective tool to reducing transmission and ensuring that those that become ill and miswork or become infected do not become seriously ill and miswork. But you're right, Your Honor. This order is somewhat different than the ones that we've seen in the past. But even then, the district court found that it straightforwardly advanced economy and efficiency. And so we think that that determination is correct and that this court should at a minimum vacate the injunction to the extent that it— to the extent that it is conflicting with that. I'm having some trouble with your attempt to distinguish this case from NFIB. Your Honor, there are several differences between this case and the OSHA mandate, which is the one at issue in NFIB. First, this isn't a course of regulation on anyone. This is an order by the President to his agencies on how to contract. That's quite different than the OSHA mandate. The OSHA mandate was also promulgated pursuant to delegated power under the Commerce Clause. Here, this is the President exercising authority in a proprietary function. And when that—when the government's exercising authority as a proprietor, Presidents have much freer hand, and Congress often delegates authority in much broader terms. And then, Your Honor, in addition, this isn't an unelected bureaucrat making a determination. This is the President, the most—singularly most accountable individual in the government, who's making the determination. And that distinguished it from the OSHA case, but also other cases that raise kind of major question— major question principles that are friends on their side of the site. And all those make that quite different. And for that reason, Your Honor, this case is much more similar to the CMS mandate, so Biden v. Missouri, which was decided on the same day. There, too, the government was acting against proprietary authority and contracting with Medicare and Medicaid providers. And the court had no problem determining that major question principles weren't implicated under that different context. We'd also point out, Your Honor, that the CMS case provides additional guidance into understanding the President's authority here. There, too, the plaintiffs in this case argued that the Secretary's authority was ministerial in nature, but the court had no problem rejecting that as well. And here, too, Your Honor, the President has long been understood to exercise broad, direct authority in directing government-wide procurement policies. If I may, I would just take a minute to address the district court's Tenth Amendment holding. So the district court, as I said, enjoined the executive order on the ground that it violated the Tenth Amendment, and that's just clearly wrong, whereas here the President is validly exercising a delegation of Article I powers. There is no violation of the Tenth Amendment, even when that authority or that exercise of power intrudes in an area traditionally reserved to the states. Of course, Your Honor, but in any event, this isn't an area that is traditionally reserved to the states. This is an order from the President telling agencies how to manage their relationship with federal contractors, and that's an inherently federal relationship. And so there is no Tenth Amendment violation here at all. I'd also like to point out, Your Honors, that in terms of the economy and efficiency determination, the acting OMB director made a determination that the cost that would be saved would far outweighó That's borne out in the CMS case where, again, the plaintiffs in this case were concerned that a similar vaccine mandate would cause mass layoffs, but that hasn't manifested, and it was perfectly reasonable for the acting OMB director to determine in this case that the cost would certainly outweigh the benefits of the vaccination requirement. The district court also enjoined the executive order on the grounds that it was procedurally invalid. We think that's, again, wrong, as every other district court has determined in reviewing these. The OMB, the FAR Council, and the task force abided by all applicable procedural requirements, and so there's just no grounds to determine that there was a procedural violation in any way in this case. And lastly, Your Honor, I think that it's worth noting that the plaintiffs in this case have claimed substantial irreparable harm would flow from the executive order. They haven't supported that determination at all or supported that claim at all by introducing record in the evidence, which is their burden to do so. The plaintiffs claim that if this was orders to go into effect, it would affect things like grant programs to their departments of justice, and there's just no indication that that's true, Your Honor. In fact, the Department of Justice issue introduced a declaration to the district court that made clear that this didn't apply to grants and it wouldn't apply to the grant that Louisiana and Mississippi have identified as potentially imperiled by it. And so there just is no grounds for an injunction based on any claims of irreparable harm. So let me ask you about the procedural requirements you just touched on. The FAR memo, as I understand it, prompted agency action. Isn't that final? Are you arguing that it's not a final action? It's not a final action, Your Honor. But why would it not be if it prompted agency action? The FAR memo itself, Your Honor, merely provided initial guidance to agencies on how to exercise their own discretion and provided a sample clause that agencies could use if they so wanted to. But unless and until agencies did so, there wouldn't be any legal consequences that would flow from it. The FAR memo itself is not final agency action, and plaintiffs don't have grounds to challenge it based on the APA. If an agency then took some action based on the FAR memo, that might be final agency action that could be challenged, but the plaintiffs haven't brought a challenge to any kind of additional agency action there, just challenging the FAR memo and the other implementing guidance here. So there is no APA challenge, and for the same reason the Procurement Policy Act doesn't apply to the FAR memo, for much the same reason. And the task force guidance challenge similarly fails for the same reason. That doesn't take effect unless and until the OMB director made an affirmative determination that it would advance the economy and efficiency of the federal government. And so on its own it had no legal force, and therefore it wasn't final agency action. And I just see my time is running out, Your Honor. I would just point out that the district court was wrong to suggest that finality was just one factor when considering review. It's a prerequisite. This court has made that clear over and over again, and so there is just no grounds to reach the question of the FAR memo and the task force guidance.  Thank you, Your Honor. Belli. Thank you, Your Honor. Good morning. Liz Merle on behalf of Louisiana, Mississippi, and Alabama. Your Honors, the President just about a week ago declared the pandemic was over on national television. This is not really about whether this order advances some reasonable or statutorily authorized objective. It's about the exercise of presidential power in a way that's not authorized by the statute. And seven courts have now agreed that they either issued injunctions or agreed that the injunctions were appropriate in this very same matter. So I want to kind of walk through some of the things. I'm going to start with the very first question. What is the declaration that the pandemic is over? What does that have to do with this? I think it's just in the context of a preliminary injunction and their claims that we don't have – we have irreparable harm, Your Honor, that should go straight to the question of the balance of equities. The President declares the pandemic over, and yet we have $100 billion in contracts between our three states that would be affected by this order. So I think that it specifically goes to their argument that there's no irreparable harm and the balance of equities favor the government. The President's declared the pandemic is over, and none of the contracting in the United States has collapsed, not in the time that this injunction has been in effect or any of the other ones have been in effect. As to the question, Your Honor, about the limiting principle, they haven't given one. In every argument that they've made, in every case that they've made, they have not produced any limiting principle on their theory. And I would specifically point you to the language of the executive order, which is carried through the other documents. The focus is on creating a healthier workforce generally, which in turn will increase efficiency and economy. If that's their theory, then there is no limit. Everything you mentioned, Judge Englehart, is within the scope of the President's discretion to control more than one-fifth of the workplace. And I would also point to the more than because while it captures, allegedly, or purports to capture federal contractors, subcontractors, it also captures very vaguely anybody who comes in contact with them. The nexus between the economy and efficiency, having to demonstrate that nexus, that's not a sufficient limiting principle? No, Your Honor. I think those are very, very broad terms, and they have not given, not in this case and not in any case, any actual limiting principle on the application of those broad terms. Do you agree that there are some executive orders that are not unconstitutional? There are some. Some executive orders, generally, they're not. Yes. All right. So there is some limiting principle that you have in mind? I think the limiting principle is it comes through the context of the statute, and I would agree that past practices may be relevant. I just don't think that any of the cases that they've cited actually support their claim that of the broad, the breadth of their application of this statute. You're talking about the Procurement Act when you say this? The Procurement Act, yes, sir. Yes, sir. So, you know, if you take, if you look at all of the cases that they've cited and all of the cases that were discussed by not only Judge Drell but every other district court, it's not that many. And those cases specifically look at, first of all, if the president is doing something that isn't directly correlated to efficiency and economy, then they look at other laws. Do other laws permit this? So in the context of anti-discrimination notices, for example, or anti-discrimination clauses in a contract, those are required by other acts of Congress. There's not, that does not exist here. What about something like, as we search for this limiting principle, what about something like the president requiring contractors to use green technology so as to be more efficient, more energy, conserving energy in the course of executing their contract with the government? Would that be something you think would fall within the president's authority? I don't think that it would. I think that the more attenuated that you get, then the less likely it is. Now, I call that to the contractor. When I was talking to your opponent, I was asking about individuals, requirements on individuals, and he candidly answered my question. So in this case, I'm talking about an imposition on the contractor. Why would that not be a valid condition on a government contract? I think you have to look at whether it's inconsistent with other principles in contracting. And so specifically here, you would look at the Competition and Contracting Act. I think that's always relevant, by the way. The Competition and Contracting Act is an overlay. And if you look at, if you go to the government's websites and look at their detailed regulations in the FAR, everything in the FAR, everything in the Competition and Contracting Act, everything that's ever happened related to federal contracting specifically pushes toward including more people to compete and allowing more competition for the government so that it drives prices down and efficiency is created through an economy. Well, along those lines, how valid is it to look at what private contractors require if they require, like for instance in this case, a vaccine or some other type of, like I gave all the examples before, if a private contractor required it, could the government in considering its conditions make a parallel evaluation? Judge Inglehart, in NASA v. Nelson, the Supreme Court did look at what private contractors had done, but specifically the Court said that private contractors, that their actions were pervasive. Here they're not pervasive. The government cited two or three simply to say, yeah, hey, some private companies are doing this too. But it's not pervasive. There's never been any evidence in the record that the government supplied in imposing this mandate that there was any pervasive requirement. So I wouldn't say that it's irrelevant. So you've got a definition for pervasive? In that particular situation, Your Honor, there were millions, millions of businesses that required it. So I think that whatever that definition is, they didn't provide it here. A handful is not millions. A handful is not pervasive. Being able to point to one or two businesses who did this in their own private, and I would also point out that their private decisions are not the same as the government. They are not constrained by the Constitution. They're not constrained by the statutory authority of the statute. These are some pretty large corporations we're talking about. The ones that they pointed to are a couple. I think Tyson, they appointed to Tyson. They pointed to one or two in the rule, and then I think they pointed to a few more in briefing. So the rule itself doesn't point to very many, and I don't think that it ever seriously contended or gave any genuine voice to the likelihood that there was no power to do this. The government simply said we have it. They were going to do this. The president said this is part of his six-point plan to vaccinate, to co-opt a state power, by the way. I mean, the president, and to Judge Drell's concern on the Tenth Amendment, the president came out on television and said he was tired of people not getting vaccinated. He was going to use, and I get it. He can use any power that actually is within his power. But this has never, ever, ever happened, and that's why NFIB is, it does matter. A pandemic like this has never, ever, ever happened, or a president has never used power for something like this? The president's never used power like this. Both are probably true, but we have had pandemics. We have had other disasters. We've had wars. This has never happened in any of those contexts, and the president, and I think that you do have to take into account what he said and what his purpose is. Judge Inglehart, and I would say that I call this, if you give a mouse a cookie, logic. The president thinks that he can do anything he wants as long as he can cabinet somehow leading to economy and efficiency. That's not what the statute permits because that would lead to delegation problems. It simply cannot be that he has such a broad authority that he can commandeer all contractors, their subcontractors, and anybody who comes in contact with them, even if they're at home. He did, the FAQs capture somebody who's a federal contractor even when they're at home. So they still have to get vaccinated too, even though that's, I think he said that we are the residents. He, I guess, gave us some free pass by saying that his order didn't extend into our residences, and then the FAQ did. So the scope of this order was always intended to be part of his plan to vaccinate the workplace, and they've never, none of the cases that the government has cited support the expansive interpretation or application of this statute. In fact, every decision I think that's come since then has been contrary to it. And even the CMS case, I think, falls in that category because there were specific language that directed the government to address health and safety, at least in some context, and I don't necessarily agree with the outcome in that case, but we're stuck with it, at least for now. But even there, the Supreme Court looked for specific language that had been applied by CMS in a specific way in the past. You do not have that here. There's one case that I would draw to your attention. It's not binding on this court. It's a nonpublished case, but it is in the, it is in, it's a Texas case, the Rung case. It's at 2016 Westlaw 8188655, and I would just point you, I think it's, it is an application of a restriction on the Procurement Act. What's the caption again? It is Rung, hang on one second, Your Honor, I'll give you the full caption. Associated Builders and Contractors of Southeast Texas v. Rung, and it's at 2016 Westlaw 8188655. It's an Eastern District, Texas case, and it's not reported in the FSUP. But it relates to the Obama Executive Order 13673, which purported to increase efficiency and cost savings in work performed by parties who contract with the federal government by ensuring they understand and comply with labor laws. And there had been some cases that dealt with labor laws, posting notices, for example, anti-discrimination laws. But this order went well beyond that, and I think that's what's happening here. This order goes well beyond any other application, and there's no other statutory hook. And I think that's key to all of the other cases, is that there is some other statutory hook that they can at least point to that would justify the more moderate actions that the President ordered, like posting notices in the workplace. Distill for me again, under the Procurement Act, where you would draw the line on requirements the President can impose, can impose on federal contractors? Where would we draw the line? Well, I think the cases would support at least some line drawing where you can point to another federal statute that imposes an obligation on the contractor or the person. So anti-discrimination laws, for example, you can point to a number of other laws that bind the contractor and that bind the government. And so they said, here's some things you need to do. And I think the scope of the action is also relevant. So that's a limiting principle. How far-reaching is it? Every indication shows that it was intended and that language did and then the agency action did capture as many people as possible within its grasp. That's what the President said he wanted to do, and that's what they did. And so there was no one who was really exempt, and they bent over backwards to make it ambiguous, to make it even less likely that you could find somebody that would be exempt by design. There weren't any religious exemptions or medical exemptions? There purported to be religious exemptions, and then the FAQs didn't provide for any actual mechanism for accommodating a religious exemption. And that's why we had testimony to that effect to explain how difficult this was to navigate. Our testimony largely went to our standing. So when they said there were religious exemptions, they didn't mean that? Is that what you're saying? They did not provide any guidance or any direct assistance to states to apply them. Did anybody get one? I couldn't answer whether anybody got one. Certainly there have been religious exemptions that have been granted under other circumstances, like the CMS mandate. In this case, we had testimony through Megan Brough, the UL lawyer, who was denied a religious exemption because the university leadership did not believe that they could grant one and then consistently allow her ever to be in contact with anybody on the campus, anywhere, that might come in contact with a federal contractor or subcontractor. So they made it exceedingly difficult to navigate any kind of exemption. Again, that was by design. I would like to address very quickly the agency action argument, because I think that Judge Drell very clearly found that there was both agency action and that the agency action was arbitrary and capricious. And he looked at the totality of the circumstances. He also looked at what they were doing to execute the order, and I think he very reasonably found that there was, in fact, agency action and that the government was being directed to go out, go out and do this now, and that these deadlines are probably the most key feature of this action, because there was no real mechanism to get out of it. It created a Hobson's choice, which he very specifically found in his ruling, and it didn't give any flexibility to the contractor to do anything other than what the government had said, and that was put this clause in your contract and then we'll tell you later what it means. And we might change what it means, too, by the way. You just agreed to whatever we tell you we want you to do. So it was a very broad directive to change the contracts, change them now, and change every contract that you can try and force them to change. I think that's agency action, and the judge took the pragmatic approach to finality, which is legally permissible. And so I would close with this, unless you have more questions. This court can affirm based on any ground that is supported by the record. There's ample evidence in this record to support the preliminary injunction. Other courts have found that based on similar evidence and similar records. We have live testimony that he found very, very persuasive, specifically Dr. Henderson. And so there's no basis at this stage to reverse his injunction. And as to the argument that the balance of equities or that there's no irreparable harm, I would just want to point out that there's a typo in the order because the order points to $100 million in contracts. It's $100 billion, and that comes from the government's own website. SAM.gov has a listing of all government contracts, and you can just run searches by state. And that's what we did, and that's how we came up with that number. But it's an enormous amount of money, and that's why he used his power. So before you slip away, the other side argues that the major questions doctrine doesn't apply because the authority here is delegated to the president who's politically accountable. And you say what? I don't think accountability is the sole decider about whether the major questions doctrine applies. The court in West Virginia v. EPA looks at every major questions doctrine. The CDC case, the Alabama Realtors case, West Virginia v. EPA, NFIB, all of these cases look to the statutory language, and the president can't exercise power that he doesn't have in the first place. So the real question is the scope of this. What does the statute authorize, and does it go so far? Can it be viewed as unbounded as the government argues that it is here? Our answer to that is no. Judge Drell's answer to that was no. Seven other courts' answers to that has been no. Thank you, Your Honors. Rebuttal. Thank you. I'd like to start, if I may, with Judge Willard's question about the limits. It's unclear what kind of power at all plaintiffs think the president has under the statute. They suggest that it has to be some kind of affirmative statutory grant. No court has ever held that. And to the contrary, this court has upheld an executive order that especially went beyond Title VII's requirements. In the U.S. v. Mississippi Power and Electric Company, the court upheld an executive order that required certain anti-discrimination provisions. And those anti-discrimination provisions required, amongst other things, affirmative action, which went beyond Title VII. So it can't be the case that the Procurement Act's grant of authority has to be tied to some other statutory authority, that that just doesn't make much sense. I'd also like to point out, Your Honor, that it is relevant that private employers have adopted similar measures. That's a strong indication that those CEOs thought that economy and efficiency would be advanced by adopting something like a vaccine mandate. It makes sense that the president, acting as the CEO of the government, took additional steps in that direction. On the major questions doctrine, Judge Willett, it's telling that in all of those cases, you have a bureaucrat exercising delegated commerce clause authority, whereas here you have the president exercising authority in a proprietary function. And when Congress legislates pursuant to its spending power, it often delegates broadly. Appropriations legislation is often done in quite broad terms. And so it makes sense that the font of authority has a different outcome. On the accommodations statute, let me say this. I just note that the clock is not running. I know. I guess they're going to hold it until you score the winning touchdown. I'm happy to sit up here and talk as much as you will have me. I appreciate it. Just a few more points, Your Honor. Under the plaintiff's theory of what the statute allows the presidents to do, the plaintiffs seem to think that Presidents Eisenhower and Kennedy and Johnson were wrong when they issued executive orders aimed at reducing anti-discrimination, that President Carter misunderstood the statute when he issued orders regarding price stability and the energy crisis, that George Bush was wrong when he issued orders about immigration and labor rights, that courts who consistently upheld those orders were wrong in their understanding of the statute, and that Congress, when it recodified this provision in 2002, was wrong in light of all that. And that just doesn't make much sense. That kind of longstanding interpretation is powerful evidence of what this statute means. And we think it's – we'd urge the Court to hesitate before rendering all of that invalid. We think that would be a problem. Justice Merrill led off by saying the government, you have never produced a limiting principle. And in response to Governor Englehart's hypos, you just thought they were a little too outlandish. And I just wonder, aside from thinking – aside from something striking you as far-fetched, what is the government's articulated limiting principle? Your Honor, the orders must bear a close nexus to the economy and efficiency of federal contracting. And courts – That sounds pretty sweeping. Your Honor, courts – the district courts – That sounds pretty limitless, not limiting. Your Honor, this statute has been in force for seven decades. The kind of parade of horribles that plaintiffs imagine have never come to be. We think that's, again, powerful evidence that this limitation has real bite. And, again, Your Honor, courts have consistently understood that to be the appropriate test, applied it in a meaningful way. And where they found that an order didn't bear a close nexus, they invalidated the order. So we think it's an entirely workable standard that does limit President's authority. And, again, that's borne out by the history of the statute, where this order has been used to achieve important aims that improve the contracting operations. Counsel, it may not be in the record, but since I asked your opponent, are you aware of any religious exemptions that have been granted? Your Honor, I'm not aware of a single individual instance. In part because this executive order was joined before the enforcement deadline went into effect, and so it's unclear whether any accommodations were processed. The executive order and the task force guidelines made clear that employers had brought authority to determine the validity of a religious or medical accommodation and take steps, whatever steps they deemed appropriate, to accommodate those individuals. So to the extent that there are some concerns about employers' failure to do so, that is an issue with the employers that I don't think bears on the validity of the executive order. But this order was enjoined right away. In December. You don't have a sample size. Precisely, Your Honor. This was enjoined nearly a month before the deadline. What are we, if anything, to make of the President's declaration that the pandemic is over? I see my time is running out, my extended time is running out, but if I just may. Your Honor, the question before this Court is whether the district court abused its discretion in December of 2021 when it enjoined the order. For the reasons we've explained, we think it hasn't. I'm sorry, we think that it did abuse its discretion. The threat posed to federal contracting by the pandemic has certainly evolved since then. To the extent that in any way undermines the Director's determination regarding the economy and efficiency, the appropriate response of this Court would be to vacate the injunction and let the district court in the first instance determine whether any of that determination has been overtaken by developments. We think that would be the appropriate steps. Thank you. The Court will take this matter under advisement.